Judy CORRIGAN

v.

METHODIST HOSPITAL, Sanford
H. Davne, MD. and Donald
Myers, MD.

Civ. A. No. 94–CV–1478.

United States District Court,
E.D. Pennsylvania.

Dec. 6, 1994.

See also, 158 F.R.D. 70.

Joseph L. Messa, Jr., Thomas W. Sheridan, Giuliana F. Robertson, Mark W. Tanner, Ominsky, Welsh and Steinberg, P.C., Philadelphia, PA, for plaintiff.

Nancy A. Nolan, Kimberly A. Cummings, Post & Schell, P.C., Philadelphia, PA, for Methodist Hosp.

Kevin H. Wright, Amalia V. Romanowicz, Wright, Young & McGilvery, P.C., Plymouth Meeting, PA, for Sanford H. Davne, M.D.

Daniel F. Ryan, III, Christine A. Egan, O'Brien & Ryan, Plymouth Meeting, PA, for Donald Myers, M.D.

## MEMORANDUM

JOYNER, District Judge.

Before this Court today is Defendant Davne's motion for partial summary judgment on claims against him relating to certain VSP Screws used in Judy Corrigan's surgery. The claims he identifies as ripe for summary judgment are those of negligence in implanting the VSP Screws, lack of informed consent in general and in particular regarding the VSP Screws, and all punitive damages claims against him.

## FACTUAL BACKGROUND

Corrigan's Complaint alleges that on July 9, 1991, she first sought medical treatment for back pain from the defendant doctors, Davne and Myers. After several months of treatment for this condition, Davne and Myers purportedly represented to Corrigan that surgery was the only available option to improve her condition. On March 5, 1992, Corrigan underwent a lumbar foramenotomy, L4–5 discectomy and posterior lateral lumbar fusion at defendant Methodist Hospital.

Following her discharge on March 14, 1992, Corrigan continued to be followed by Davne and Myers, who prescribed various narcotic medications to relieve the continued intractable pain in her back and legs, muscle spasms and cramping. These symptoms apparently failed to abate and, in fact, grew worse with time. As a result, in October, 1992, Corrigan consulted doctors Mark Kotopka, John Esterhai and M.D. Cheatal at the Hospital of the University of Pennsylvania. On November 11, 1992, after several clinical examinations and tests, including an MRI, she was diagnosed as suffering from a thoracic meningiomal tumor at the T6 level.

Corrigan filed this lawsuit on March 4, 1994 alleging that the defendant doctors and Methodist had failed to obtain her informed consent for the lumbar fusion surgery in that 1) she was not advised that they planned to use the Acromed VSP plate and pedicle screw system [1] in the surgery; 2) there was a risk of screw failure which could lead to an increase in pain, suffering and disability; 3) the use of the VSP plate and pedicle screw system was still considered investigational for use in lumbar fusion procedures; or 4) that Davne and Myers had a financial interest in Acromed by virtue of the fact that they held stock options and served as members of Acromed's Medical Advisory Board. The complaint further alleges that all defendants were negligent in failing to appropriately diagnose and treat Corrigan's meningiomal tumor with the result that she was forced to suffer unnecessary surgery and pain.[2]

## SUMMARY JUDGMENT STANDARD

█ In considering a motion for summary judgment, a court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must

---

1. There is some confusion over what devices were actually used in the surgery. The complaint alleges that the VSP plate and pedicle screw system were used and Corrigan's experts state that VSP pedicle screws were implanted. However, the "implant log" states that VSP Bone Screws and Isola Rods were actually the devices used. If there is a difference between the two, it will be, of course, a fact issue for the jury to decide which device was used in Corrigan's surgery and what its FDA status was. For the purposes of this Motion, we refer to the devices as VSP Screws.

2. Earlier, this Court dismissed a claim that defendants engaged in a civil conspiracy to circumvent FDA restrictions on the marketing, labeling and use of the Acromed VSP system.

determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2514. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

### DISCUSSION

*1. NEGLIGENCE*

■ To make out a prima facie case of medical malpractice, a plaintiff must present expert testimony to show, to a reasonable degree of medical certainty, that the "acts of the physician deviated from good and acceptable medical standards." *Mitzelfelt v. Kamrin*, 526 Pa. 54, 62, 584 A.2d 888, 892 (1990). A "specialist acting within his or her specialty . . . 'is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment' of diseases within the specialty." *Maurer v. Trustees of University of Pennsylvania*, 418 Pa.Super. 510, 517–18, 614 A.2d 754, 758 (1992), *app. granted*, 534 Pa. 640, 626 A.2d 1158 (1993) (quoting *Pratt v. Stein*, 298 Pa.Super. 92, 156, 444 A.2d 674, 708 (1982)).

Davne asserts that "plaintiff's experts fail to establish that Dr. Davne departed from accepted standards of care by implanting the VSP Screws into the plaintiff's spine." Therefore, he argues, he is entitled to summary judgment on this claim.

■ Insofar as Davne attempts to distinguish between the physical aspects of the surgery and the decision to perform and use the VSP Screws in the surgery, the attempt must fail. The claim of negligence is that it was negligent for Davne to use the VSP Screws at all, not that he was negligent in their physical implantation. *See Pratt*, 298 Pa.Super. 92, 444 A.2d 674 (negligent to use particular product in treatment); *Hawkins v. Greenberg*, 159 Ga.App. 302, 283 S.E.2d 301 (1981) (doctor negligent when injected drug patient was allergic to, even though injection done properly).

Corrigan's experts have alleged that Davne departed from accepted standards of care by implanting the VSP Screws. For example, Dr. Butler opined that "the surgical procedures performed was unnecessary [and] constituted substandard care on the part of Drs. Davne and Myers." The "surgical procedures performed" involved implanting the VSP Screws. Therefore, there is an issue of fact as to whether Davne deviated from the accepted standard of care in implanting the VSP Screws.

■ Davne also asserts that "plaintiff has failed to show through her experts that her alleged injuries are somehow causally related to the VSP Screws" because they are admittedly properly positioned and have not broken or fractured. Proximate cause is a required showing in any negligence action. In a medical malpractice action, the medical opinion "need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct *increased the risk* of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm." *Jones v. Montefiore Hosp.*, 494 Pa. 410, 417, 431 A.2d 920, 923–24 (1981)

■ Dr. Peyster opined that the "unnecessary lumbar surgery confused the issue and led to delay in diagnosis of her meningioma, with resultant permanent neurological sequelae in the form of unremitting pain and hyperesthesia in the right lower extremity." Dr. Shady opined that "non-indicated lumbar *instrumentation* and fusion operation caused increased low back and leg pain which has further disabled her. It is also my opinion

that had ... the *instrumentation* and fusion procedure not been performed, that the patient may have had a different outcome with the possibility of going back to work." (emphasis added) These doctors made a direct causative link between the surgery and "instrumentation" (i.e., the VSP Screws) and Corrigan's injuries. It is irrelevant to Corrigan's claim whether the VSP Screws are properly placed and still whole. Her claim of negligence is that they should not have been implanted at all, and that their implantation has caused Corrigan injury. Corrigan's experts have established a causal connection between the VSP Screws and her injuries sufficient to send the issue to a jury.

Finally, Davne argues that Corrigan cannot seek future damages because, according to him, there is "no cause of action in Pennsylvania for possibility of future injury." The cases he cites in support of this proposition are inapposite to the facts at bar. Davne cites cases where plaintiffs with no present injuries sought damages for injuries they might sustain in the future. Asbestos cases are the most common in this area, where people who were exposed to asbestos sought recovery for the increased risk of contracting asbestosis. Courts have held that plaintiffs must wait till they actually become ill before they can seek recovery. *Giffear v. Johns Manville Corp.*, 429 Pa.Super. 327, 632 A.2d 880 (1993); *Lubowitz v. Albert Einstein Med. Center*, 424 Pa.Super. 468, 623 A.2d 3 (1993).

■ Here, Plaintiff has alleged and supported with medical opinions that she has suffered a present injury. At the least, this injury is the delay of diagnosis of the tumor, unnecessary surgery and implantation of foreign elements into her spine. These alleged present injuries, if proven at trial, allow her to seek future damages as well.

## 2. INFORMED CONSENT

■ Pennsylvania's informed consent doctrine maintains that a mentally competent adult in a non-emergency setting must grant informed consent before treatment or surgery. *Festa v. Greenberg*, 354 Pa.Super. 346, 350, 511 A.2d 1371, 1373 (1986), *app. denied*, 515 Pa. 580, 527 A.2d 541 (1987). A doctor must "apprise the patient 'of such important

matters as the nature of the therapy, the seriousness of the situation, the disease and organs involved and the potential results of the treatment.'" *Id.* (quoting *Salis v. United States*, 522 F.Supp. 989, 997 (M.D.Pa. 1981)). If consent is not given, then the physician is considered to have committed a "technical battery." *Kaskie v. Wright*, 403 Pa.Super. 334, 340, 589 A.2d 213, 216, *app. denied*, 529 Pa. 634, 600 A.2d 954 (1991).

■ Pennsylvania uses the prudent patient standard, where the question is whether "the physician disclosed those risks which a reasonable man would have considered material to his decision whether or not to undergo treatment." *Festa*, 354 Pa.Super. at 353, 511 A.2d at 1375. In Pennsylvania, an expert is needed to establish that alternatives and/or risks exist. *Id.* at 357, 511 A.2d at 1377. However, once that is established, it is up to the jury to determine whether the undisclosed information was material. *Id.*

In addition, "expert medical testimony is necessary to establish the causal nexus of the injury to the tortious conduct in those cases where the connection is not obvious." *Maliszewski v. Rendon*, 374 Pa.Super. 109, 113, 542 A.2d 170, 172 (1988), *app. denied*, 520 Pa. 617, 554 A.2d 510 (1989). The patient must show either that he or she suffered "'an injury, the risk of which was undisclosed, *or* the patient actually suffers an injury that would not have occurred had the patient opted for one of the undisclosed methods of treatment.'" *Id.* at 114, 542 A.2d at 172 (quoting *Neal v. Lu*, 365 Pa.Super. 464, 478, 530 A.2d 103, 111 (1987)).

Davne argues that Corrigan's informed consent claim must fail because she signed a consent form, because he was under no duty to disclose the FDA status of the VSP Screws, because she has not provided expert testimony of the risks and alternatives to surgery, and because she has not shown a causal connection between an undisclosed risk and an injury.

■ First, Corrigan alleges that she did not grant informed consent in general, because Davne's consent form was handed to her shortly before surgery, when she was already sedated. This raises a question as to

whether she actually consented at all to the surgery.

■ Second, Corrigan's experts opined that the investigational status of the VSP bone screws created a risk. Dr. Butler stated that "[g]iven the status of the device, the patient should have been informed that these [VSP] screws were investigational, meaning they had not been proven to be safe and effective. The failure to convey such information to the patient is tantamount to a failure to obtain the informed consent of that patient." [3]

Corrigan's experts also opined to alternate tests that were indicated by her symptoms, any one of which would have shown that surgery was not called for. For example, Dr. Shady opined that a "spinal tumor or some pathology higher in the spine should have been investigated as a possible cause of this patient's pain, weakness and bladder dysfunction, particularly, without findings in the lumbar spine which would correlate with the above described symptoms. Certainly such investigation should have been completed before any surgery was attempted." These opinions create an issue of fact to be resolved by a jury.

■ Third, Corrigan's experts have raised an issue of fact as to whether the failure of consent caused the injury. Dr. Shady opined that the unwarranted surgery was responsible for increased lower back and leg pain and further disabled Corrigan. Dr. Peyster opined that the unnecessary surgery resulted in permanent neurological harm. These opinions create an issue of fact as to whether the undisclosed risk of the investigational status of the VSP bone screws and the undisclosed possibility of additional and alternate tests would have encouraged Corrigan to opt for a different treatment, and therefore, not suffer her injuries.

**3.** Davne also argues that Corrigan was informed of all "surgical" risks, and therefore, received all appropriate information. *Kaskie*, 403 Pa.Super. 334, 589 A.2d 213 (fact that doctor was alcoholic and unlicensed to practice medicine not information relevant to surgical procedure; therefore,

## 3. PUNITIVE DAMAGES

■ Davne argues that Corrigan has not supported her claim for punitive damages because she has not shown outrageous conduct or conscious disregard of the risks on his part. Corrigan alleges that Davne "acted willfully, wantonly, and with reckless disregard for the consequences of [his] conduct, acts and omissions as described more fully at length herein." Complaint ¶ 95. In 1992, our Court held that identical language stated a claim for punitive damages. *Fields v. Graff*, 784 F.Supp. 224, 226 (E.D.Pa.1992); *See also McDaniel v. Merck, Sharp & Dohme*, 367 Pa.Super. 600, 622–23, 533 A.2d 436, 447 (1987), *app. denied*, 520 Pa. 589, 551 A.2d 215 (1988).

■ Corrigan alleges that all defendants knowingly performed experimental surgery on her, without her consent, and with disastrous results. Corrigan's experts, including Carl A. Larson, Ph.D, P.E., Director, Division of Surgical and Rehabilitation Devices at the FDA during the time Acromed sought approval for use of the VSP Screws, have opined that the VSP Screws were an experimental device. Corrigan alleges that Davne knowingly used the VSP Screws in her surgery. A jury may well find that this is outrageous. Accordingly, because Corrigan has raised facts to support a claim for punitive damages, summary judgment will not be granted.

An appropriate Order follows.

### ORDER

AND NOW, this 6th day of December, 1994, upon consideration of Defendant Davne's Motion for Partial Summary Judgment and responses thereto, the Motion is hereby DENIED.

not relevant to informed consent issue). Dr. Butler opined that the investigational status of the VSP Bone Screws meant that they had not been proven to be safe and effective. Use of them in surgery, therefore, is a surgical risk that a jury could well find was material.